# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 20-3047

GLORIA J. GREER, APPELLANT,

V.

DENIS MCDONOUGH,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Argued November 1, 2022                                    Decided June 12, 2023)

*Kenneth M. Carpenter*, of Topeka, Kansas, for the appellant.

*Shanthala Raj*, with whom *Richard J. Hipolit*, Deputy General Counsel; *Mary Ann Flynn*, Chief Counsel; and *Sarah W. Fusina*, Deputy Chief Counsel, were on the brief, all of Washington, D.C., for the appellee.

Before BARTLEY, *Chief Judge*, and TOTH and JAQUITH, *Judges*.

TOTH, *Judge*: Gloria Greer, the daughter and substitute in this appeal of Army veteran Walter Brinkman, challenges a January 2020 Board decision that denied her father entitlement to non-service-connected pension benefits. The Board determined that the veteran's net worth, which included a family trust, rendered him ineligible for those benefits. This appeal concerns two issues of first impression. First, whether the Board must provide notice of its decision that complies with the requirements of 38 U.S.C. § 5104(b) as amended by the Veterans Appeals Improvement and Modernization Act of 2017, which has come to be referred to as the "AMA." Second, whether the Board must obtain an expert legal opinion when interpreting a purportedly complex document such as the trust agreement in this case. We answer both questions in the negative. But we nevertheless remand for the Board to cure inadequacies conceded by the Secretary in its statement of reasons or bases.

## I. BACKGROUND

Mr. Brinkman served in the Army from 1951 until 1953. In July 2018, he established the Brinkman Family Wealth Defender Trust (Trust). The following month, he applied for non-service-connected pension. VA requested additional information from the veteran regarding the

disparity between the income he reported on his application and the amount the IRS reported to VA for 2017 and that the veteran submit VA Form 21-8049, Request for Details of Expenses. Mr. Brinkman responded but did not submit the requested form. In March 2019, VA informed him that, although it did not receive the requested form, intervening changes in the pension regulations required the veteran to submit a different form containing asset and property transfer information. Mr. Brinkman completed and submitted the new form, and the claim progressed.

Prior to the initial decision, VA requested more information about the Trust. Mr. Brinkman reported the value of the Trust assets as $191,169.06 and provided a copy of the Trust agreement. After reviewing all the information of record, the VA Pension Management Center (PMC) denied the veteran's claim in a June 2019 decision because it found that his net worth was a bar to pension. That is, that the corpus of his estate comprising the Trust assets and other property was sufficient to meet his basic needs without VA assistance. (VA uses the terms "corpus of the estate" and "net worth" as synonyms.) Mr. Brinkman sought higher-level review under the AMA, asserting that VA did not explain its determination that the Trust assets were accessible to him and therefore countable as part of his net worth. When the Agency adhered to its prior determinations he appealed to the Board, reiterating that he did not have access to the Trust assets.

The Board then issued the decision on appeal. It first determined that the October 2018 change in pension regulations—which established a bona fide net worth limit of $123,600 for pension eligibility—did not apply to Mr. Brinkman because his claim was received in August 2018. Accordingly, the Board assessed his net worth under the prior regulations, which did not include a specific net worth cap. Rather, these regulations required the Board to determine whether

> the corpus of the estate of the Veteran (and that of any spouse), is such that under all the circumstances, including consideration of the annual income of the Veteran, his spouse, and any cohabitating children, it is reasonable that some part of the corpus of such estate be consumed for the Veteran's maintenance.

R. at 7 (citing 38 U.S.C. §§ 1521, 1522; 38 C.F.R. § 3.274 (2018)); *see also* 38 C.F.R. § 3.263 (2018) (Corpus of estate; net worth). Net worth is determined by ascertaining "the market value, less mortgages or other encumbrances, of all real and personal property owned by the Veteran except the Veteran's dwelling and personal effects." *Id.*; *see* 38 C.F.R. § 3.275(b) (2018). And whether it is reasonable that some part of a veteran's estate should be consumed for his maintenance includes consideration of the veteran's income, the feasibility of converting property into cash without substantial sacrifice, the veteran's life expectancy, the number of dependents, and the rate

2

of depletion of the veteran's estate. 38 C.F.R. § 3.275(d). Summarizing these provisions, the Board stated: "Essentially, pension entitlement is based on need and that need does not exist if the Veteran's estate is of such size that he could use it for living expenses." R. at 8.

The Board listed the PMC's findings and noted the veteran's contrary argument that the Trust assets should not be included in net worth calculations because he could not access them. After independently reviewing the terms of the Trust agreement, the Board rejected that argument, finding that the Trust's purpose is "to provide financial assistance to the Veteran during his lifetime, and to maximize government and public assistance for the Veteran while preserving the estate for his children." *Id.*

The Board identified two aspects of the Trust agreement to support this reading. First, the Trust was to be liquidated at the veteran's death and distributed to named beneficiaries. Second, the Trust established a "Supplemental Needs Trust" under the laws of Indiana for an unnamed "Beneficiary"—i.e., the veteran—for the purpose of providing for that Beneficiary's care and maintenance where "such is not provided for 'by any public agency, office or department of any state or the United States.'" R. at 9 (quoting R. at 88). Further, the trustee of the Supplemental Needs Trust

> is specifically directed to maximize benefits from government or private assistance programs on the Beneficiary's behalf; not use Trust funds where it may "supplant, impair or diminish any governmental benefits or assistance for which Beneficiary may be eligible or . . . may be receiving"; and to shut down the Supplemental Needs Trust where its existence would "result in a reduction or loss of Beneficiary's entitlement program benefits."

*Id.* (quoting R. at 87).

Based on this reading, the Board considered the Trust value along with the veteran's other assets and determined he was not eligible for pension on the ground that his net worth was too high. Mr. Brinkman appealed to this Court but, unfortunately, passed away while his case was pending. The Court then granted Ms. Greer's unopposed motion to substitute as the appellant.

## II. ANALYSIS

Ms. Greer's appeal does not reach the merits of the Board's analysis. Instead, she raises two preliminary allegations of error. First, she argues that the Board failed to provide the notice required by AMA-amended section 5104(b) when it issued its decision. Second, she argues that the Board was not qualified on its own to read the Trust agreement and determine whether the

3

Trust should be counted as part of the veteran's net worth and, thus, should have sought an independent expert legal opinion on the matter. The Secretary contends that we needn't reach these issues because he concedes that the case should be remanded for the Board to cure two reasons or bases defects. But Ms. Greer does not agree to a remand on such narrow grounds and urges the Court first to resolve her arguments.

A. *Applicability of Section 5104(b) to Board Decisions in the Modernized System*

Under 38 U.S.C. § 5104(a), a claimant must be provided with notice of "a decision by the Secretary under section 511 of [title 38] affecting the provision of benefits to a claimant," which includes "an explanation of the procedure for obtaining review of the decision." Before the AMA, in the event that a benefit sought was denied, the notice required by subsection (a) also had to include "a statement of the reasons for the decision" and "a summary of the evidence considered by the Secretary." 38 U.S.C. § 5104(b) (2012); *see also* Veterans' Benefits Amendments of 1989, Pub. L. No. 101-237, § 115(a), 103 Stat. 2062, 2065–66 (codifying the "statement" and "summary" requirements at then-38 U.S.C. § 3004).

Since the early days of the Court, we have presumed that section 5104 (or its predecessor, section 3004) applies to Board decisions. Thus, we stated in *Rosler v. Derwinski*, 1 Vet.App. 241, 249 (1991), that section 3004(a) obliged the Board to inform a claimant that a new 120-day appeal period began to run after the Board Chairman denied a motion for reconsideration. In *Thompson v. Brown*, 8 Vet.App. 169, 177 (1995), the Court reiterated that section 5104 applied to the Board and reconciled section 5104(a)'s command to "provide" notice and 38 U.S.C. § 7104(e)'s command to "mail" notice by concluding "that section 5104(a)'s general command to provide certain types of notices is given content as to [Board] decisions by section 7104(e)'s more specific command to provide copies of [Board] decisions by 'mail.'"

The Federal Circuit initially followed *Rosler* and *Thompson* and presumed the applicability of section 5104 to Board decisions. For example, in *Cummings v. West*, 136 F.3d 1468, 1472 (Fed. Cir. 1998), *overruled on other grounds by Bailey v. West*, 160 F.3d 1360 (Fed. Cir. 1998), the court took as a given that section 5104(a) applied, while holding that the provision's terms did not mandate an explanation of how, per *Rosler*, seeking reconsideration at the Board could affect appealing to this Court. The Federal Circuit's later statements on the matter are more direct. *See, e.g.*, *Jaquay v. Principi*, 304 F.3d 1276, 1284 (Fed. Cir. 2002) (en banc) ("Under 38 U.S.C. § 5104,

4

an adverse decision of the [Board] must be accompanied by a notice explaining the reasons for the decision and 'an explanation of the procedure for obtaining review of the decision.'").

Thus, under the system in place before the AMA, both this Court and the Federal Circuit understood section 5104(a)'s requirement that notice be provided upon issuance of "a decision by the Secretary under section 511(a)" to apply to the Board. This system still exists today alongside the AMA's "modernized" one and is known as the "legacy" system. *Mattox v. McDonough*, 56 F.4th 1369, 1375 (Fed. Cir. 2023).

The passage of the AMA in 2017 overhauled much of the legacy system. As part of this overhaul, Congress amended section 5104(b) by adding a detailed, itemized list of requirements for each notice issued under the statute. This list includes

> (1) Identification of the issues adjudicated.
> (2) A summary of the evidence considered by the Secretary.
> (3) A summary of the applicable laws and regulations.
> (4) Identification of findings favorable to the claimant.
> (5) In the case of a denial, identification of elements not satisfied leading to the denial.
> (6) An explanation of how to obtain or access evidence used in making the decision.
> (7) If applicable, identification of the criteria that must be satisfied to grant service connection or the next higher level of compensation.

AMA, Pub. L. No. 115-55, § 2(e), 131 Stat. 1105, 1106. Congress explained that this change was intended to "help veterans better understand VA's decisions on their claims" and "to help better inform the veteran's decision regarding whether to appeal VA's rating decision." H.R. Rep. No. 115-135, at 3 (2017), *as reprinted in* 2017 U.S.C.C.A.N. 97, 99. The AMA's provisions do not apply to a "legacy claim"—a claim on which the initial decision is issued before February 19, 2019. *Mattox*, 56 F.4th at 1375.

Here, Ms. Greer argues that the Board failed to provide notice of its decision that complied with the detailed requirements of section 5104(b) established by the AMA. Specifically, she asserts that the Board did not identify the findings favorable to Mr. Brinkman and did not identify the unsatisfied elements of his claim. The Secretary does not dispute that the AMA governs this pension claim, since the veteran received his initial decision on it in June 2019. But the Secretary maintains that, even in the AMA's modernized system, a Board decision isn't subject to section 5104 at all because it isn't a "decision by the Secretary under section 511," an argument Ms. Greer rejects.

5

This dispute about whether section 5104 was ever properly understood to apply to Board decisions has arisen in recent cases but has not been resolved. *See, e.g.*, *Mattox*, 56 F.4th at 1376 n.6; *Cowan v. McDonough*, 35 Vet.App. 232, 238 (2022), *appeal docketed*, No. 22-2227 (Fed. Cir. Sept. 20, 2022). We resolve the issue today with respect to Board decisions in the modernized system on a more straightforward basis than those advanced by the parties: After the passage of the AMA, Congress made clear that section 5104(a) is not applicable to Board decisions.

In August 2022, after briefing in this case was complete but before oral argument, Congress passed the Honoring Our PACT Act of 2022, Pub. L. No. 117-168, 136 Stat. 1759. The PACT Act added subsections (c) and (d) to section 5104, which, respectively, permit the Secretary to provide the notice mandated by subsection (a) electronically and require him annually to solicit recommendations from stakeholders regarding improving notice and to publish those recommendations. *Id.* § 807(a)(2), 136 Stat. at 1806. Crucial to this case, Congress included a rule of construction, which states: "None of the amendments made by this section shall be construed to apply section 5104(a) of such title [i.e., title 38] to decisions of the Board of Veterans' Appeals under chapter 71 of such title." *Id.* § 807(b), 136 Stat. at 1806.

When the Court interprets a statute, we always begin with the text. *Lacey v. Wilkie*, 32 Vet.App. 71, 75 (2019). If that text is unambiguous, then the statute's plain meaning controls and the Court's inquiry is finished. *King v. Burwell*, 576 U.S. 473, 486 (2015). When interpreting the text, the Court looks to "'the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.'" *Lacey*, 32 Vet.App. at 75 (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)).

Here, the decisive text is not "a decision by the Secretary under section 511" but rather the PACT Act's rule of construction for section 5104. The rule states that the amendments to section 5104 "shall not be construed to apply section 5104(a) . . . to decisions of the Board." Critically, "apply" is being used transitively rather than intransitively. The rule of construction doesn't say that the amendments themselves shall not be read to apply to Board decisions; it says that the amendments shall not be read to apply *section 5104(a)*—that is, make section 5104(a) applicable—to Board decisions. From this plain language, we understand the implicit but clear instruction from Congress to be that section 5104(a) did not apply to decisions of the Board under the AMA at the time of the PACT Act's passage and that this inapplicability is to continue thereafter.

Had Congress meant something different, it would have said something different. Courts presume that Congress means what it says and says what it means. *Oklahoma v. Castro-Huerta*, 142 S. Ct. 2486, 2496 (2022). In other words, the plain language of the provision reads as a continuance of Congress's previously held understanding—that is, that AMA-amended section 5104(a) did not apply to the Board at the time the PACT Act was passed and should not apply to it now. The rule of construction "did not 'merely' express 'an opinion' about the meaning of [section 5104]; rather, it reflected what Congress understood 'its own prior acts to mean.'"[1] *Sackett v. EPA*, 598 U.S. ___, ___, No. 21-454, 2023 WL 3632751, at \*35 (May 25, 2023) (Kavanaugh, J., concurring in the judgment) (quoting *Bell v. New Jersey*, 461 U.S. 773, 785 n.12 (1983)). We see no other reasonable way to read this rule of construction—a part of a duly enacted statute, which must "'be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.'" *Wolfe v. McDonald*, 28 F.4th 1348, 1354–55 (Fed. Cir. 2022) (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)).

And if subsection (a) does not apply to the Board, then neither does subsection (b). Subsection (a) governs which VA decisions must be accompanied by notice. Subsection (b) then governs what the notice issued under subsection (a) must contain. It imposes no separate or unique obligations to issue notice; instead, it merely mandates what "each notice provided under subsection (a) shall include."

The Court finds additional support for this understanding of the rule of construction within the broader structure of title 38 as amended by the AMA. Specifically, chapter 51 (which contains the notice provision at issue here) is dedicated to "Claims, Effective Dates, and Payments," all of which are aspects of the VA disability system typically under the initial province of the agency of original jurisdiction (AOJ). The AOJ is the first entity in VA's claims system to receive and process a claim, generally assigns effective dates, and oversees the distribution of payments to eligible claimants. In contrast, chapter 71 is specifically entitled "Board of Veterans' Appeals" and provides

---

[1] Thus, we discern no complication from the fact that the Board decision in this case was issued after passage of the AMA but before passage of the PACT Act. Where "a judicial decision is not yet final, Congress may change the law applicable generally, and the court must apply the changed law to pending cases." *Guangdong Wireking Housewares & Hardware Co. v. United States*, 745 F.3d 1194, 1201 (Fed. Cir. 2014). "Congress may indeed direct courts to apply newly enacted, outcome-altering legislation in pending civil cases." *Bank Markazi v. Peterson*, 578 U.S. 212, 229 (2016). This sort of congressional direction becomes problematic only when it "compels findings or results under old law," such as, "in Smith v. Jones, Smith wins." *Id.* at 231 (cleaned up). Applying the PACT Act's rule of construction in this case doesn't implicate the separation-of-powers concerns discussed in these cases.

the governing statutes for the Board—including the Board's very own decision notice provision at 38 U.S.C. § 7104. When Congress intended the Board to fulfill certain responsibilities under chapter 51, it explicitly named the Board in the relevant provisions. For example, Congress directs "the Board of Veterans' Appeals" in section 5103A(f)(2)(A) to remand a claim to the AOJ if it identifies or learns of a duty to assist error by the AOJ. And in section 5109, Congress consistently refers to the obligations of the "Secretary" until subsection (d)(1), when it names the Board and directs it to remand a claim to the AOJ to obtain an advisory medical opinion if necessary. These clarifications of Board responsibility were added by the AMA. *See* Pub. L. No. 115-55, § 2(c), (d), (j), 131 Stat. at 1106, 1109. But Congress did not mention the Board when the AMA expanded the notice requirements in section 5104. We must presume that omission was intentional. *See Spicer v. McDonough*, 61 F.4th 1360, 1365 (Fed. Cir. 2023).

And for those who find legislative materials persuasive, Congress seems to have left no doubt regarding the intended applicability of the changes it was making to section 5104(b) as part of the AMA. In its discussion of the "detailed decision notification letters" mandated by that legislation, Congress clearly stated that "[t]he intent of this provision is to help better inform the veteran's decision regarding whether to appeal VA's *rating decision*." H.R. Rep. No. 115-135, at 3 (emphasis added). Prior to the AMA, there was no requirement that AOJs provide with their decisions anything like the sort of detailed explanations required by that legislation. The new 5104(b) provisions sought to cure potential confusion caused by a barebones rating decision.

Thus, the Court holds that, based upon the rule of construction included by Congress in the PACT Act, section 5104 as amended by the AMA does not apply to Board decisions. So, to the extent Ms. Greer contends that amended section 5104 imposes requirements that are substantively distinct from those imposed by section 7104, any noncompliance by the Board with respect to section 5104 wasn't error.

Because our conclusion—that the rule of construction set forth in the PACT Act precludes the application of section 5104 to Board decisions in the modernized system—suffices to resolve this appeal, we offer no opinion on the rule's application to Board decisions in the legacy system. Nor need we address the Secretary's broader argument that section 5104 should never have been understood to apply to Board decisions. Resolution of those issues must await an appropriate case.

8

B. *Board's Competence to Address Unfamiliar Legal Issues*

Next, we consider Ms. Greer's argument that Board members must secure an independent expert opinion when interpreting a trust document like the one in this case because they are not qualified to do so on their own. Because the Trust was prepared by "an expert," she contends that "only another expert"—not a Board member—"should be offering an opinion about its effects" on the pension claim. Appellant's Br. at 12. Requiring the procurement of expert legal opinion in these circumstances, Ms. Greer maintains, is a natural extension of our decision in *Colvin v. Derwinski*, 1 Vet.App. 171 (1991), which held that the Board may only rely on independent medical evidence and cannot use its own lay judgment on medical questions. We disagree.

The Court did not reach its holding in *Colvin* merely because medical questions can be highly complex inquiries. Instead, we determined that expert opinions were necessary because a Board member generally does not have the requisite knowledge and competence to opine on medical matters. *See id.* at 172, 175; *see also Delrio v. Wilkie*, 32 Vet.App. 232, 242 (2019). This is so, quite simply, because most Board members are not "qualified through education, training, or experience to offer medical diagnoses, statements, or opinions." 38 C.F.R. § 3.159(a)(1) (2022); *see Espiritu v. Derwinski*, 2 Vet.App. 492, 495 (1992) (citing Federal Rule of Evidence 702 for the proposition that "scientific, technical, or other specialized knowledge" must be provided by "a witness qualified as an expert by knowledge, skill, experience, training, or education"). Physicians and other healthcare professionals "offering medical opinions in veterans benefits cases are nothing more or less than expert witnesses." *Nieves-Rodriguez v. Peake*, 22 Vet.App. 295, 302 (2008). "The purpose of utilizing an expert . . . is to assist the trier of fact in understanding complex evidentiary materials in a claim." *Bielby v. Brown*, 7 Vet.App. 260, 268 (1994). Such experts are able to speak intelligently on the kinds of medical issues that are ubiquitous in VA benefits cases. And this ability distinguishes medical experts from most Board members, which is why the Court has consistently maintained that medical questions are for medical experts. *See Arline v. McDonough*, 34 Vet.App. 238, 251 (2021); *Delrio*, 32 Vet.App. at 242. In short, Board members generally are not qualified to resolve medical issues without assistance from expert witnesses.[2]

---

[2] There are two important caveats to this statement. Board members are permitted to exercise their judgment regarding medical questions on which any layperson would be competent to offer an opinion. *See Davidson v. Shinseki*, 581 F.3d 1313, 1316 (Fed. Cir. 2009). And Board members, like any adjudicator of fact, may make commonsense inferences from medical evidence. *Kahana v. Shinseki*, 24 Vet.App. 428, 435 (2011).

There is no basis for extending *Colvin*'s rationale to the legal context. The Board may be called upon to confront issues of law that are complex or novel. But these are not issues wholly outside the realm of the Board members' education, knowledge, training, or experience in the way that medical issues are. All Board members are licensed attorneys "in good standing of the bar of a State," appointed by the Secretary with the approval of the President of the United States. 38 U.S.C. § 7101A(a). While Board members might not have specialized knowledge regarding trusts—or other areas of law that are frequently relevant to the adjudication of benefits, like family or criminal law—a trust agreement is a legal document, the construction of which is generally an issue of law. *See Malachowski v. Bank One, Indianapolis*, 590 N.E.2d 559, 565–66 (Ind. 1992) (stating the rule in Indiana, the law of which governs the Supplemental Needs Trust in this case); *see also Taylor Energy Co. LLC v. United States*, 975 F.3d 1303, 1314–15 (Fed. Cir. 2020) (construing a trust agreement in the course of adjudicating a government contract dispute). Resolving legal issues is at the core of their official responsibilities. *See* 38 U.S.C. § 7104(a) ("Decisions of the Board shall be based . . . upon consideration of all . . . applicable provisions of law and regulation."). And Board members are fully capable of bringing their lawyer's skillset to bear on non-veterans-law matters. Ms. Greer does not cite any authority for the proposition that an adjudicator is categorically incompetent to resolve a validly presented legal issue that is outside the adjudicator's typical area of focus.

Indeed, if the Board could not resolve purportedly complex questions of trust law without the assistance of an expert legal witness, then neither could this Court. Or, for that matter, the Federal Circuit. *Cf. Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350 (Fed. Cir. 2006) (characterizing the judges of that court as "generalists" with respect to trade cases). We are not experts in trust law, and certainly not in the trust law of Indiana. (Unlike medical principles, legal principles can vary from one jurisdiction to another.) We spend most of our time and energy resolving legal issues unique to veterans law, but we must occasionally tackle issues from the broader legal world when litigants raise them. *See, e.g.*, *Patricio v. Shulkin*, 29 Vet.App. 38, 44–46 (2017) (discussing Philippine marriage law); *see also, e.g.*, *Sneed v. McDonald*, 819 F.3d 1347, 1352–53 (Fed. Cir. 2016) (discussing California contract principles). This Court has a specialized subject matter, but when it comes to those broader legal questions, we are generalists just like the Board.

10

By and large, "[f]ederal judges are generalists." *Chicago Truck Drivers v. CPC Logistics, Inc.*, 698 F.3d 346, 350 (7th Cir. 2012). In fact, there is a long tradition in this country of generalist adjudicators reviewing the written work—whether it be a will, contract, deed, or trust agreement— of attorneys specializing in a particular legal field. Yet as far as we know, judges do not routinely solicit the formal input of experts when interpreting these texts. That is because judges are capable of becoming better informed on any abstruse, arcane, or esoteric issue of law they might confront. Put differently, judges have time-tested tools for augmenting their generalized legal competence with specific legal knowledge.

These tools are also available to the Board when it is presented with a novel or complex legal matter. The principal one: Board members (and their staffs) can conduct their own research through authoritative sources like treatises and caselaw. Legal research is a lawyer's stock-in-trade. Moreover, the Board can always rely on the help offered by a claimant, who is free to submit argument about the proper interpretation of a trust or other relevant legal document submitted in connection with a claim. *See* 38 C.F.R. § 20.700(b) (2022); *cf. RLJCS Enters. v. Prof'l Ben. Trust Multiple Emplr. Welfare Ben. Plan & Trust*, 487 F.3d 494, 498 (7th Cir. 2007) ("Argument about the meaning of trust indentures, contracts, and mutual-to-stock conversions belongs in briefs, not in 'experts' reports.'"). What is more, in the exercise of its sound discretion, the Board can request (through the Chairman) a precedent opinion from VA's General Counsel on a legal question. 38 C.F.R. § 14.502 (2022); *see Paralyzed Veterans of Am. v. Sec'y of Veterans Affairs*, 308 F.3d 1262, 1263–64 (Fed. Cir. 2002). Indeed, it just so happens that the General Counsel's Office long ago published an opinion on whether assets placed in an irrevocable special needs trust designed to maximize government benefits should be included in a claimant's net worth for improved pension purposes. (Spoiler: They should. *See* VA Gen. Coun. Prec. 33-97 (Aug. 29, 1997).)

Of course, these resources are no guarantee that the Board won't err in its construction of a legal document like the Trust agreement. But legal competence is not the same as legal infallibility. If a claimant believes the Board erroneously interpreted a legal document, the claimant may appeal and argue the proper interpretation to this Court and, if necessary, the Federal Circuit— where she will encounter more legal generalists. *See Ribaudo v. Nicholson*, 21 Vet.App. 137, 144 (2007) ("In addition to the multiple layers of VA decision review, [claimants] have two separate layers of appeal of right to independent judicial review."). Ms. Greer has had the opportunity to do

11

so, but she has not developed an argument as to the proper construction of the Trust agreement in this Court.

In sum, the Court rejects the attempt to pigeonhole Board members as competent only to address run-of-the-mill veterans law issues. *Colvin*'s rule regarding medical questions cannot be analogized to legal questions, and we decline to impose a presumption of incompetence on the Board when it comes to broader legal issues—a presumption incompatible with this country's adjudicatory tradition. We hold that the Board member in this case was not required to secure an expert legal opinion in order to competently assess the Trust.

## C. *Secretarial Concession of Error*

Though we reject the appellant's arguments, we accept the Secretary's concession that remand is warranted to correct two reasons or bases errors. First, the Secretary asserts that the Board must reevaluate the value of the Trust. In its decision, the Board stated the Trust's value was $286,264.89. But when Mr. Brinkman submitted information about the Trust in 2019, he reported the value as $191,169.06. The Board did not explain this discrepancy. Second, the Secretary asserts that the Board must explain which version of 38 C.F.R. § 3.274 applies to the veteran's claim. In its decision, the Board found that the pre-September 2018 version applied because the claim was initially filed in August 2018. However, the record reflects that the claim was "reopened" in November 2018, after the revised regulation took effect, and that VA applied the new regulatory provisions to the claim when it required a new assets and property form be submitted. On remand, the Board must determine which version of the regulation applies and, if it is the revised version, whether that changes its assessment of the claim.

## III. CONCLUSION

The Board's January 8, 2020, decision is VACATED and the matter is REMANDED for readjudication consistent with this opinion.